**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5566-18T2

IN THE MATTER OF
MAURICE JACKSON,
MERCER COUNTY
CORRECTIONS CENTER.

_____

Submitted January 6, 2021 – Decided January 25, 2021

Before Judges Whipple and Firko.

On appeal from the New Jersey Civil Service Commission, Docket No. 2018-2491.

Alterman & Associates, LLC, attorneys for petitioner (Stuart J. Alterman and Timothy J. Prol, on the briefs).

Paul R. Adezio, Mercer County Counsel, attorney for respondent Mercer County Corrections Center (Lynn Suzette Price, Assistant County Counsel, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent New Jersey Civil Service Commission (Jonathan S. Sussman, Deputy Attorney General, on the statement in lieu of brief).

PER CURIAM

Petitioner Maurice Jackson appeals from a June 26, 2019 final administration action of the Civil Service Commission (Commission) upholding his fifty-day suspension. We affirm.

We discern the following from the hearing record. Petitioner worked for the Mercer County Corrections Center (MCCC) as a corrections officer. On October 24, 2017, petitioner was assigned to control room two (CR2), which serves as a communications link and controls traffic to and from the units. CR2 is the base of operations for the issuance of equipment, keys, and paperwork. Petitioner was responsible for monitoring activities within the jail during the overnight shift and ensuring "everything was running normally." Part of his responsibilities included reviewing monitors and operating the control panel that opens the cell doors to two pods within MCCC, A pod and B pod.

On that date, another corrections officer, Sergeant Kenneth Fitzpatrick, was "doing rounds" through A pod, B pod, medical, and APC units to ensure the safety and security of all officers and inmates. During these rounds, Sergeant Fitzpatrick approached door A35, which leads to MCCC's maximum security unit and is controlled by the panel in CR2. Sergeant Fitzpatrick requested over the radio that the door be opened by petitioner, but the request went unanswered.

A second call was made to CR2 to alert petitioner that Sergeant Fitzpatrick was at the door.

After multiple radio calls went unanswered, Captain Michael Kownacki, the shift commander for the 11:00 p.m. to 7:00 a.m. shift, adjusted the monitor in the master control room to ascertain why the door was not being opened. Captain Kownacki then observed petitioner "seated in the chair with his back facing the camera." Petitioner was eventually aroused by a phone call or a radio transmission from another officer and reached for the control panel to open the door. Because petitioner did not respond to the radio calls to open the door, he was relieved from his post for the remainder of his shift, and an incident report was prepared. Petitioner claimed he did not hear the transmission because his radio was not on an appropriate listening level because he had used the speaker phone and forgot to reset the volume.

On November 14, 2017, the MCCC issued a Preliminary Notice of Disciplinary Action (PNDA) to petitioner setting forth charges arising from his failure to respond to the radio calls to open door A35. The PNDA charged petitioner with conduct unbecoming a public employee, N.J.A.C. 4A:2-2.3(a)(6); neglect of duty, N.J.A.C. 4A:2-2.3(a)(7); and other sufficient cause,

3

N.J.A.C. 4A:2-2(a)(12), for sleeping while on duty, in violation of the Mercer County Public Safety Table of Offenses and Penalties.

On January 25, 2018, the MCCC held a departmental disciplinary hearing sustaining the charges. On February 16, 2018, the MCCC issued a Final Notice of Disciplinary Action (FNDA) sustaining all charges listed in the PNDA and proposed a fifty-day working suspension penalty. Petitioner appealed the determination to the Commission, which transmitted the appeal to the Office of Administrative Law (OAL) to be heard as a contested case pursuant to N.J.S.A. 40A:14-202(d).

The OAL heard the matter on February 13, 2019. The MCCC presented the testimony of Captain Kownacki, the shift commander on the day in question, Sergeant Fitzpatrick, who placed the calls to open door A35, and Phyllis Oliver, the retired Deputy Warden of MCCC. Oliver testified she reviewed the video of the incident, and it appeared petitioner was asleep during his shift. Petitioner testified on his own behalf. The AOL allowed the parties to file post-hearing submissions until May 15, 2019.

After reviewing the evidence, the Administrative Law Judge (ALJ) issued a twenty-three-page initial decision sustaining all charges against petitioner.

A-5566-18T2

The ALJ found petitioner's testimony was inconsistent, incredulous, and self-serving stating:

> This account of events . . . runs contrary to [petitioner's] testimony that, when working the "A Shift" or overnight shift, noise can travel from the control room and into the living units of MCCC. [Petitioner] explained that he turns the volume on his radio down so the sound . . . does not carry into the pods where it can awaken the inmates who should be asleep during this time. . . . In light of this practical motivation to minimize unnecessary noise when working in the control room during an overnight shift, it would further seem to reason, however, that if the [petitioner] needed to make or receive phone calls during that shift, he would avoid using the speaker phone since that would presumably generate the same type of conversational noise he was trying to avoid by keeping his radio at a low level.

After reviewing the surveillance video, the ALJ determined:

> [Petitioner] was asleep in his chair on duty at MCCC on October 24, 2017, from approximately 3:15 a.m. until approximately 3:26 a.m. During this period, the [petitioner] can be observed in the surveillance video . . . sitting in his chair, not moving with his head noticeably tilting towards, and possibly resting on, his left shoulder. The [petitioner] does not change his position during this time to give himself a field of view of the monitor that is positioned behind his left shoulder and, despite the [petitioner's] testimony that he could see the monitor from where he was seated, the monitor and its contents were outside his field of vision from where he was seated as his head can be observed to be facing away from the monitor during this time.

A-5566-18T2

The ALJ concluded that the MCCC had proven that the charges were supported by the evidence. Petitioner appealed the matter to the Commission. On July 31, 2019, the Commission, after conducting its review and making an independent evaluation, affirmed the charges and dismissed petitioner's appeal. This appeal followed.

Petitioner has raised three points but essentially argues that the Commission's decision was "arbitrary, capricious and unreasonable" because it was based on the ALJ's factual findings and credibility determinations, which were not supported by substantial credible evidence and upheld a penalty that was "unwarranted," "excessive," and "contrary to the principles of progressive discipline." In addition, petitioner asserts the Commission erred as a matter of law by finding the MCCC satisfied its burden of proof because the evidence was in "equipoise." We reject these arguments.

Our review of agency action is limited. "An appellate court ordinarily will reverse the decision of an administrative agency only when the agency's decision is 'arbitrary, capricious or unreasonable or is not supported by substantial credible evidence in the record as a whole.'" Ramirez v. N.J. Dept. of Corr., 382 N.J. Super. 18, 23 (App. Div. 2005) (quoting Henry v. Rahway State Prison, 81 N.J. 571, 579-80 (1980)). "[A]n administrative agency's

interpretation of statutes and regulations within its implementing and enforcing responsibility is ordinarily entitled to our deference." Wnuck v. N.J. Div. of Motor Vehicles, 337 N.J. Super. 52, 56 (App. Div. 2001) (quoting In re Appeal by Progressive Cas. Ins. Co., 307 N.J. Super. 93, 102 (App. Div. 1997)).

Therefore, "if substantial credible evidence supports an agency's conclusion, a court may not substitute its own judgment for the agency's even though the court might have reached a different result." Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992) (citing Clowes v. Terminix Int'l, 109 N.J. 575, 587 (1998); Henry, 81 N.J. at 579-80). Additionally, a presumption of reasonableness attaches to the actions of administrative agencies. City of Newark v. Nat. Res. Council in Dep't of Env'tl Prot., 82 N.J. 530, 539-40 (1980). We defer to the expertise of agencies where substantial evidence supports the agency's determination. In re Stallworth, 208 N.J. 182, 194 (2011). Accordingly, the findings of the agency should not be reversed because they are based on "sufficient, competent, and credible evidence." N.J.S.A. 52:14B-10(c).

Moreover, we "defer to [the ALJ's] credibility findings that are often influenced by matters such as observations of the character and demeanor of witnesses and common human experience that are not transmitted by the

A-5566-18T2

record," State v. Locurto, 157 N.J. 463, 474 (1999) (citing State v. Jamerson, 153 N.J. 318, 341 (1998); Dolson v. Anastasia, 55 N.J. 2, 7 (1969); State v. Johnson, 42 N.J. 146, 161 (1964)), giving "due regard to the opportunity of the one who heard the witnesses to judge their credibility." Logan v. Bd. of Rev., 299 N.J. Super. 346, 348 (App. Div. 1997) (citing Jackson v. Concord Co., 54 N.J. 113, 117-18 (1969)).

Petitioner argues that the record does not support the charge of conduct unbecoming a public employee, and the MCCC did not meet its burden of proof as to N.J.A.C. 4A:2-2.3(a)(6). Rather, petitioner highlights that: (1) "[n]one of the witnesses saw [him] sleeping"; (2) the door was opened after he answered the phone; (3) video footage showed him moving at various points during his shift; (4) his eyes were not visible on the video, making it difficult to determine whether he was sleeping; (5) he made a log detailing activities he undertook during his shift; and (6) he testified that he was awake. We reject petitioner's argument.

Conduct unbecoming refers to "any conduct which adversely affects the morale or efficiency of the bureau . . . [or] which has a tendency to destroy public respect for municipal services." Karins v. Atl. City, 152 N.J. 532, 554 (1998) (quoting In re Emmons, 63 N.J. Super. 136, 140 (App. Div. 1960)

8

(quoting In re Zeber, 156 A.2d 821, 825 (1959))). The conduct in question can be sufficient if it is "'such as to offend publicly accepted standards of decency.'" Id. at 555 (quoting In re Zeber, 156 A.2d at 825).

Discussing conduct unbecoming an officer, we have said, "[A] finding of misconduct . . . may be based merely upon the violation of the implicit standard of good behavior which devolves upon one who stands in the public eye as an upholder of that which is morally and legally correct." In re Emmons, 63 N.J. Super. at 140 (citing Asbury Park v. Dep't of Civ. Serv., 17 N.J. 419, 429 (1955)). We defined conduct unbecoming an officer as "'any conduct which adversely affects the morale or efficiency of the bureau . . . (or) which has a tendency to destroy public respect for municipal employees and confidence in the operation of municipal services.'" Ibid. (quoting In re Zeber, 156 A.2d at 825). The agency's finding that petitioner was asleep is supported by substantial evidence in the record, thus the ALJ's determination that petitioner's violations constituted conduct unbecoming an officer is not arbitrary, capricious or unreasonable.

We also emphasize that adherence to order and procedure in prisons is critical, and violating protocol has the potential to subvert order, which can easily escalate in such a highly charged environment. Bowden v. Bayside State

Prison Dept. of Corr., 268 N.J. Super. 301, 306 (App. Div. 1993); see also Henry, 81 N.J. at 579 ("Maintaining discipline within law enforcement agencies is important for the safety and security of the public.").

Finally, we address petitioner's argument that the seriousness of the incident does not warrant a fifty-day suspension. He also contends the suspension is contrary to the principles of progressive discipline. Again, we disagree.

"A reviewing court should alter a sanction imposed by an administrative agency only 'when necessary to bring the agency's action into conformity with its delegated authority.'" In re Herrmann, 192 N.J. 19, 28 (2007) (quoting In re Polk, 90 N.J. 550, 578 (1982)). A reviewing court "has no power to act independently as an administrative tribunal or to substitute its judgment for that of the agency." Ibid. (quoting Polk, 90 N.J. at 578). When reviewing an agency's disciplinary action, we consider "whether such punishment is so disproportionate to the offense, in light of all the circumstances, as to be shocking to one's sense of fairness." Id. at 28-29 (quoting Polk, 90 N.J. at 578).

Under the concept of progressive discipline, "discipline based in part on the consideration of past misconduct can be a factor in the determination of the appropriate penalty for present misconduct." Hermann, 192 N.J. at 29. This

concept is utilized in two ways. "[P]rinciples of progressive discipline can support the imposition of a more severe penalty for a public employee who engages in habitual misconduct." Id. at 31. On the other hand, progressive discipline has been used "to mitigate the penalty for a current offense." Id. at 33. In other words, progressive discipline can result in the downgrading of a penalty when an employee "has a substantial record of employment that is largely or totally unblemished by significant disciplinary infractions." Ibid.

Progressive discipline, however, is not "a fixed and immutable rule to be followed without question." In re Carter, 191 N.J. 474, 484 (2007). "[P]rogressive discipline is not a necessary consideration when reviewing an agency['s] . . . penalty when the misconduct is severe, when it is unbecoming to the employee's position or renders the employee unsuitable for continuation in the position, or when application of the principle would be contrary to the public interest." Hermann, 19 N.J. at 33. It can be bypassed "when the employee's position involves public safety and the misconduct causes risk of harm to persons or property." Ibid.

Because corrections officers are "empowered to exercise full police powers," N.J.S.A. 2A:154-4, they represent "law and order to the citizenry and must present an image of personal integrity and dependability in order to have

the respect of the public." In re Phillips, 117 N.J. 567, 576 (1990) (quoting Twp. of Moorestown v. Armstrong, 89 N.J. Super. 560, 566 (App. Div. 1965)); see also Bowden, 268 N.J. Super. at 305-06 (noting the great importance of maintaining order and discipline within a prison). Therefore, "[i]n matters involving the discipline of police and corrections officers, public safety concerns may also bear upon the propriety of the . . . sanction." Carter, 191 N.J. at 485.

Viewing the record in light of our Supreme Court's decision in Carter, we do not consider the fifty-day suspension to be disproportionate because of public safety concerns. We reject the argument that the suspension was arbitrary, capricious, and unreasonable.

We conclude that sufficient, competent, and credible evidence in the record supports the Commission's final disciplinary action. Under our standard of review, we see no basis to interfere with that determination. Any additional arguments raised in petitioner's submissions that have not been specifically addressed were found to lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

12

A-5566-18T2